Victor CARPENTER, et al., Plaintiffs,

v.

The CITY AND COUNTY OF
SAN FRANCISCO, et al.,
Defendants.

No. C–90–1836–JPV.

United States District Court,
N.D. California.

Sept. 11, 1992.

Thomas Steel, Steel, Clarence & Buckley, Americans United for Separation of Church and State, Fred Blum, American Jewish Congress, Margaret C. Crosby, American Civ. Liberties Union Foundation of Northern California, Inc., San Francisco, Cal., for plaintiffs.

Louise H. Renne, City Atty., Dennis Aftergut, Chief Asst. City Atty., Burk E. Delventhal, Mara E. Rosales, Arthur R. Greenberg, Deputy City Attys., San Francisco, Cal., for defendants.

## ORDER RE: CROSS–MOTIONS FOR SUMMARY JUDGMENT

VUKASIN, District Judge.

## I. INTRODUCTION

The cross-motions of the parties for summary judgment came on regularly for hearing on January 16, 1992, before the Honorable John P. Vukasin, Jr., United States District Judge. Thomas Steel, Esq., Margaret Crosby, Esq., Fred Blum, Esq., and John Beattie, Esq. appeared for plaintiffs. Louise H. Renne, City Attorney, by Deputy City Attorneys Mara E. Rosales and Arthur R. Greenberg, appeared for defendants.

The Court has considered the complaint filed in the instant action, the affidavits filed in support of and in opposition to the cross-motions, all of the evidence submitted to the Court by the parties and the arguments of counsel.

The parties are asking this Court to rule that there is no genuine issue of a material fact and each of the respective moving parties is entitled to judgment as a matter of law.

Summary judgment, where appropriate, is a favored method of resolution. When a properly supported motion for summary judgment is made, the adverse party must step forth and state specific facts showing there is, in fact, a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In ruling on the cross-motions for summary judgment, the Court is required to interpret the evidence and justifiable inferences in the light most favorable to the opposing party. *Id.*, at 255, 106 S.Ct. at 2513–14. Given that there is no genuine issue of material fact in dispute in this case, the Court considers the parties' cross-motions for summary judgment as a matter of law.

## II. NATURE OF ACTION

This action concerns the presence of a Latin Cross in a public park owned and maintained by the City and County of San Francisco atop Mount Davidson. On June 28, 1990, plaintiffs, various residents of San Francisco, filed a complaint in this Court against defendants, the City and County of San Francisco, the San Francisco Recreation and Park Commission and Mary Burns, General Manager of the Recreation and Park Department ("S.F."). Plaintiffs allege that S.F.'s ownership and maintenance of the Mount Davidson Cross violates the First and Fourteenth Amendment to the United States Constitution by infringing on their right to be free from government establishment of religion.

Plaintiffs also allege injuries under the California Constitution. Specifically, they allege that S.F.'s conduct violates Article I, Section 4 and Article XVI, Section 5 of the California Constitution.

### III. FINDINGS OF FACT

#### A. Historical significance

San Francisco, through its Recreation and Park Commission ("the Commission"), owns the land commonly known as Mount Davidson, a 39.42 acre public park. San Francisco gained full title to the land of Mount Davidson Park in 1932.

In 1923, prior to municipal ownership, the first Easter Sunrise service was held on Mount Davidson. In conjunction with this service, several wooden crosses were erected, and each was successively destroyed. After S.F. gained ownership, the Board of Park Commissioners voted to authorize the allocation of city funds to build a permanent cross atop Mount Davidson. The commissioners also authorized the installation of floodlights, to be illuminated during Easter.

The historical records [1] in this case reflect that S.F. built the Mount Davidson Cross as a public monument and work of art. In about May of 1933, the Finance Committee of the San Francisco Board of Supervisors requested advice from the San Francisco City Attorney on whether appropriating city funds for the erection of a permanent cross on Mount Davidson was legal.

Relying on the then relevant decisions interpreting the California Constitution,[2] the City Attorney advised the Board of Supervisors that the proposal to erect a cross on park property was constitutional.

However, recognizing that the proposal called for the erection of a structure deemed a work of art by the people of San Francisco under the San Francisco Charter, the City Attorney advised that Art Commission approval of the design and location of the monument was required prior to its erection or placement on city property. San Francisco heeded the advice of its legal counsel.

About August 1933, the Park Commission retained a noted architect, George W. Kelham, to design the cross. Mr. Kelham submitted the design and model of the cross to the Art Commission for its approval. On September 12, 1933, the Art Commission approved the design, model and proposed location of the cross on Mount Davidson. Thereafter, the project proceeded in the same manner as any public works contract—the contracts for construction and flood lighting of the cross were awarded to the lowest responsible bidder after a competitive bid process was undertaken.

The construction of the Mount Davidson Cross was completed in 1934. The cross is a large, unadorned concrete and steel structure, which stands 103 feet tall and 39 feet across. The Mount Davidson Cross is a plain, latin cross, "having a long upright shaft with a shorter crossbar traversing it above the middle." [3] In a dedication ceremony in 1934, President Franklin D. Roosevelt participated in a civic-minded celebration by pressing a golden telegraph key sending a signal from Washington, D.C., through a special direct circuit provided by Western Union to illuminate the Mount Davidson Cross. Estimates of the size of the crowd at the dedication ceremony range as high as 50,000 people. A

---

1. A detailed discussion of the history of the Mount Davidson Cross is set forth in Exhibit 2 of the Declaration of Marie Bolton, entitled "The Contemplative Ideal in Public Space: The Cross at Mt. Davidson Park, San Francisco, 1923–1990."; [see also Exhibits 1, 2, 3 to Decl. of Rosales.]

2. At the time the City decided to construct the Mount Davidson Cross in 1934, the Establishment Clause of the United States Constitution did not apply to the states. It was not until 1947, fourteen years after the Cross had been

built, that the U.S. Supreme Court held in *Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), that the Establishment Clause of the U.S. Constitution was applicable to the states via the Fourteenth Amendment. The California Constitution's Establishment Clause was not added to the California law until 1974, 40 years after the Cross was constructed.

3. Webster's Third New International Dictionary of the English Language Unabridged, p. 1276 (1976).

copper box is inside the foundation of the structure. It contains newspapers, telephone directories, two Bibles, two rocks from the Garden of Gethsemane, a jug of water from the Jordan River, and other items.

Between 1934 and 1987, the Mount Davidson Cross was at times illuminated during the week before Easter and sometimes during the Christmas season. At other times, the Mount Davidson Cross was illuminated nightly. Over the past three years, plaintiffs, and other persons concerned, made repeated requests that S.F. cease its ownership and illumination of the Mount Davidson Cross. On February 15, 1990, in direct response to continued appeals, the Commission decided to retain the Mount Davidson Cross and the land on which it stands, but to refrain from ever illuminating the cross again. Following the Commission's decision, plaintiffs filed this action.

### B. Physical Setting

The Recreation and Park Department ("the Department") currently spends no resources to maintain the Mount Davidson Cross. Mount Davidson Park is maintained as an urban eucalyptus forest and is used as an open space natural area—akin to a wilderness setting. Mount Davidson Park is located in western San Francisco, far away from City Hall.

The record reflects that even on a clear day, the Mount Davidson Cross is not visible or partially visible to the naked eye, or identifiable as a cross, from most San Francisco locations. In locations where the Mount Davidson Cross is visible, the naked eye sees a structure in the form of a cross at the top of a hill surrounded by, or partially obstructed from view by, trees in a residential neighborhood in close proximity to Sutro Tower,[4] which is more than nine times taller. Sutro Tower, not the Mount

Davidson Cross, dominates the western San Francisco horizon.

San Francisco does not illuminate, adorn, or decorate the Mount Davidson Cross. San Francisco does not promote the Cross in literature or encourage or sponsor the use of Mount Davidson Park for any kind of religious activities. There are no signs identifying the Mount Davidson Cross as belonging to the city. The Mount Davidson Cross cannot be seen at night. The Mount Davidson Cross is not in front of City Hall, adjacent to City Hall, or near any other City-owned building.

### C. Cultural Aspects

The Mount Davidson Cross can be properly viewed as one of the works of art in S.F.'s public art collection. The cross' design, crafted by a noted architect, was approved by the Art Commission pursuant to the city Charter. San Francisco's public art collection is extensive and extremely varied, and includes many monuments, sculptures and murals on city buildings. The collection also includes many objects associated with particular religions, such as sculptures of Buddha, Madonna, and St. Francis of Assisi, the patron saint for whom San Francisco is named, as well as the collective Holocaust Memorial sculptures. Art and cultural heritage are inextricably intertwined throughout S.F.'s public art collection. The evidence before this Court demonstrates that given the unique historical background surrounding its erection and dedication, the Mount Davidson Cross has attained recognition as a cultural landmark, often associated with other notable San Francisco landmarks, such as Coit Tower, the Conservatory of Flowers, the Windmill, and the Golden Gate Bridge.[5]

### IV. CONCLUSIONS OF LAW [6]

#### A. Overview

As the facts outlined above indicate, the original and contemporary history,

---

**4.** Sutro Tower is a large, plain, unadorned television transmitter located atop a hill in the western part of San Francisco.

**5.** This Court takes judicial notice of the private commercial advertisements, books and maps submitted by S.F. which depict the Mount

Davidson Cross along with other prominent San Francisco landmarks.

**6.** To the extent any of the Conclusions of Law are or may be deemed to be findings of fact, they are hereby referred to and made a party of

landmark quality, geographic location and physical setting of the Mount Davidson Cross offer this Court an entire range of characteristics never discussed in any other judicial decisions. In analyzing the various court decisions that offer guidance to this Court on interpreting both the California and United States Constitutions, one common thread arises and forms the basis for this Court's evaluation of the Mount Davidson Cross: This Court must avoid using sweeping generalities, but rather must engage in a careful, detailed, and factually serious examination of the entire context of the particular structure before it.

▆▆▆ The Ninth Circuit has established procedures for adjudicating federal cases involving California state constitutional issues. *See Hewitt v. Joyner*, 940 F.2d 1561, 1565 (9th Cir.1991). In this Circuit, federal constitutional issues should be avoided when the alternative ground is one of state constitutional law. *Id.* at 1565. Following this rule, when interpreting state law, a federal court is bound by the decision of the highest state court. *Id.*

### B. California Constitution

The California Constitution guarantees the "[f]ree exercise and enjoyment of religion without discrimination or preference....." Article I, Section 4. This provision is known as the "no preference" clause. *See Okrand v. City of Los Angeles*, 207 Cal.App.3d 566, 579, 254 Cal.Rptr. 913 (1989). The California Constitution also prohibits S.F. from making "an appropriation, or to pay from any public fund whatever, or to grant anything to or in aid of any religious sect, church, creed, or sectarian purpose." Article XVI, Section 5 (The 'ban on aid to religion' clause).

#### 1. The No Preference Clause

▆▆▆ The leading, and most closely related, California Supreme Court case interpreting the "no preference" clause of the California Constitution is *Fox v. City of*

*Los Angeles*, 22 Cal.3d 792, 150 Cal.Rptr. 867, 587 P.2d 663 (1978).[7] In *Fox*, the California Supreme Court affirmed an order enjoining the thirty-year practice by the City of Los Angeles of illuminating a huge, single-barred cross on City Hall during the Christmas holidays, and enjoining the eight-year practice of illuminating the cross on Easter Sundays, both Latin and Eastern Orthodox.

However, the Supreme Court did not consider or adopt a simple "per se" rule, as the one being advanced by plaintiffs, that the mere existence of a publicly owned cross on public land violates the California Constitution. To the contrary, by its own clear statement, "[o]ur case is marked by the location, size, and visibility of the Los Angeles cross, and also by the additional facts we discuss below [which indicate that the real purpose of the city's display was a religious one]." *Id.* 22 Cal.3d at 795, 150 Cal.Rptr. at 869, 587 P.2d at 665. Analyzing these factors, the cross at issue in *Fox*, which was illuminated on city hall and visible for many miles in many directions, was found to violate the no preference clause of the California Constitution.

The Supreme Court noted that "[i]n the California Constitution there is no requirement that each religion always be represented." *Fox*, 22 Cal.3d at 795, 150 Cal. Rptr. at 869, 587 P.2d at 665. Rather, " '[t]he Government may depict objects with spiritual content, but it may not promote or give its stamp of approval to such spiritual content.' " *Id.*, 22 Cal.3d at 797, 150 Cal.Rptr. at 870, 587 P.2d at 666, *citing Allen v. Hickel*, 424 F.2d 944, 948 (D.C.Cir. 1970). The *Fox* cross promoted such spiritual content by giving it the stamp of governmental approval through the illumination on city hall. Thus, *Fox* illustrates a rejection of an analysis that focuses exclusively upon the structure, without examining whether that structure, in its full context, actually promotes religion.

---

those facts as fully as though set out in the Findings of Fact.

**7.** The majority in *Fox* only addressed the "no preference" clause, Article I, Section 4, of the

California Constitution. The majority did not address the merits of the case under the "ban on aid to religion" clause, Article XVI, Section 5.

The Mount Davidson Cross differs greatly from the cross at issue in *Fox*. First, and most importantly, the *Fox* cross was illuminated on city hall, thereby giving it the official stamp of governmental approval. The Mount Davidson Cross, on the other hand, is not illuminated, and is not on, in front of, adjacent to, or even near city hall, or near any city owned building. Moreover, there are no signs identifying the Mount Davidson Cross as belonging to the city. Second, the *Fox* cross was highly visible for many miles in many directions, whereas the Mount Davidson Cross is located in a relatively remote place, and is only partially visible on a clear day, and can not be seen at night. Therefore, given its physical setting, the Mount Davidson Cross, unlike the *Fox* cross, in no way suggests government endorsement of, or preference for, religion, in violation of Article I, Section 4, of the California Constitution.

The importance of examining the context of a religious display to determine whether it violates the "no preference" clause was further recognized in *Okrand v. City of Los Angeles*, 207 Cal.App.3d 566, 254 Cal. Rptr. 913 (Cal.App. 2 Dist.1989). In *Okrand*, the court was faced with a challenge to the display of an unlit menorah in the rotunda of the Los Angeles City Hall. Analyzing the context of the menorah at issue in *Okrand*, the court easily distinguished it from the cross at issue in *Fox*. The *Okrand* court compared the lighted cross in *Fox*, which "was highly visible for many miles in many directions," with the menorah, which "stood unlit in a corner of the [city hall] rotunda." *Id.* Moreover, the *Okrand* court recognized the importance of that particular menorah's "unique historical background." [8] Based on these factors, the court concluded "that in the context in which it allowed the Katowitz Menorah to be displayed, the city exhibited no preference for the Jewish religion nor promoted it." *Id.*

Applying this context outlook to this case, the Mount Davidson Cross is as similar to the *Okrand* menorah as it is different from the *Fox* cross. Visible for many miles in many directions, the *Fox* cross was brightly illuminated on city hall giving it the official stamp of governmental approval, and bore no specific historical significance. The *Okrand* menorah, on the other hand, while placed in city hall, was unlit and carried a unique historical background. In comparison, the Mount Davidson Cross stands unilluminated in a remote area of the city, and is only partially visible on a clear day. Additionally, the quality and significance of the Mount Davidson Cross' historical and cultural heritage, while different from that in *Okrand*, is comparable on a local level. As discussed earlier in this opinion, the Mount Davidson Cross was designed by a noted architect as a work of art under the city Charter. Additionally, the President of the United States, Franklin D. Roosevelt, participated in the dedication ceremony when he pressed a golden telegraph key sending a signal from Washington, D.C. through a special direct circuit provided by Western Union to illuminate the cross. Moreover, the cross, which has stood for fifty-seven years, serves as a reminder of an empirical past, and has become well recognized as a cultural landmark similar to other notable San Francisco landmarks, like the Golden Gate Bridge, Coit Tower, the Windmill, and the Conservatory of Flowers. Thus, given the context in which the Mount Davidson Cross is displayed, the city, as in *Okrand*, exhibits no religious preference.

The leading Ninth Circuit case to analyze the California "no preference" clause is *Hewitt v. Joyner*, 940 F.2d 1561 (9th Cir. 1991). *Hewitt* involved a challenge to San Bernadino County's ownership and maintenance of a public park that contained exclusively immovable religious statues depicting scenes from the New Testament. Interpreting *Fox* and *Okrand*, the Ninth Circuit undertook a fact-specific contextual analysis of the physical and historical setting of the park, and held: "When viewed

---

**8.** The menorah in *Okrand* was crafted in the 19th Century by an Italian artist, and remained in the Great Synagogue of Katowitz in Poland until World War II. *See Okrand*, 254 Cal.Rptr. at 914.

in its entire historical context, the County's ownership of the park depicts a government-endorsement of the Christian faith." *Id.* at 1569.

The entire historical context of the Mount Davidson Cross, however, is easily distinguishable from the statuary park at issue in *Hewitt.* After taking ownership of the statuary park in *Hewitt,* the County dedicated it as "Desert Christ Park." The county "printed brochures which identify each of the statuary scenes by reference to Bible passages." *Id.* at 1563. This official brochure also described the statuary located on the church property adjoining the park, and described these statues as being part of the park. "In fact, the largest of the park's statues, the Last Supper tableau, straddles the property line of the church and the park." *Id.* Moreover, the public park was advertised in the telephone directory as a "World Famous Theme Park ... depicting life of Christ." *Id.* In this context, the Ninth Circuit found that "[t]he effect and message of the park is a religious one."

In contrast, S.F. does not endorse the Mount Davidson Cross, or any message that it may send, in any manner. It does not highlight the structure in tourist literature, or promote or emphasize it in any way. The Mount Davidson Cross is not identified as belonging to the city. San Francisco does not advertise the park as a religious theme park, nor is there an official brochure referencing biblical passages or providing general religious messages.

Additionally, the location of the Mount Davidson Cross in no way suggests governmental endorsement of, or preference for, religion in general, or Christianity in particular. The Mount Davidson Cross is not in close proximity to a church and in no way is it associated with a church. The *Hewitt* biblical statuary park, on the other hand, was geographically located next to a church and the statues were commingled with church property, thereby emphasizing its religious nature and effect. Further-more, the park atop Mount Davidson was not dedicated and named a religious theme park, but rather, as described above, has rich historical significance. The *Hewitt* biblical statuary park, in contrast, was a bequest to the government, did not evolve from historical events, and could make no legitimate claim to historical significance. Rather its name, "Desert Christ Park," merely signifies its religious message. Thus, when viewed in its historical context, S.F.'s ownership of the Mount Davidson Cross, unlike the biblical statuary Park in *Hewitt,* does not depict a government-endorsement of the Christian faith.

Therefore, in viewing its unique historical and physical setting in light of the controlling precedent, S.F.'s ownership and display of the Mount Davidson Cross does not violate the no preference clause of Article I, Section 4 of the California Constitution.

### 2. The Ban on Aid to Religion Clause

█ "In addition to the no preference clause in Article I, Section 4, the California Constitution [Art. XVI, § 5] includes a broad ban on the use of public property or funds to support religious purposes." *Hewitt,* 940 F.2d at 1569. Article XVI, Section 5 "preclude[s] the spending of any public money to directly support any religious group." *Fox v. City of Los Angeles,* 22 Cal.3d 792, 800, 150 Cal.Rptr. 867, 872, 587 P.2d 663, 668 (1978) (Bird, C.J. concurring) (emphasis in the original).[9] This clause "forbids all forms of governmental aid to religion, whether that aid be in the tangible form of cash or in the intangible form of prestige and power." *Id.,* 22 Cal.3d at 802, 150 Cal.Rptr. at 873, 587 P.2d at 669 (Bird, C.J., concurring), citing *California Educational Facilities Authority v. Priest,* 12 Cal.3d 593, 604–05, 116 Cal.Rptr. 361, 369, 526 P.2d 513, 521 (1974). Additionally, " 'the fact that a statute has some identifiable secular objective will not immunize it from further analysis to ascertain whether it also' directly and substantially advances religion." *Fox,* 22 Cal.3d at

---

**9.** The majority in *Fox* did not address the application of Article XVI, Section 5 to the merits of the case. *See,. supra,* footnote 3.

802, 150 Cal.Rptr. at 873, 587 P.2d at 669 (Bird, C.J. concurring), *quoting Priest*, 12 Cal.3d at 604–05, 116 Cal.Rptr. at 369, 526 P.2d at 521.

The leading Ninth Circuit case interpreting Article XVI, Section 5, and the relevant California cases, is *Hewitt v. Joyner*, 940 F.2d 1561 (9th Cir.1991). In *Hewitt*, the Ninth Circuit found that the ban on aid to religion clause forbids taxpayer support of the biblical statuary park owned and maintained by the County of San Bernadino. Specifically, the facts indicated that the County paid for the maintenance of the statues, advertised the park in the phone book, and printed brochures, all at the taxpayers' expense. The Ninth Circuit concluded that "the California people have written their constitution to guard against exactly this type of situation."

In the case *sub judice*, however, there is no expenditure of taxpayers funds in support of or in aid of religion in violation of Article XVI, Section 5. The challenge in this case is to S.F.'s ownership of the Mount Davidson Cross, and to the display of the Mount Davidson Cross on public lands. In this case, unlike in *Hewitt*, S.F. does not spend any money to maintain the Mount Davidson Cross. Nor does it advertise the Mount Davidson Cross, or print brochures, or spend any money to support the Mount Davidson Cross at the taxpayers expense.[10]

The Ninth Circuit, in *Hewitt*, further recognized the development of a two-part test in recent California Supreme Court precedent for determining if a government practice violates the ban on aid to religion clause. See *Hewitt*, 940 F.2d at 1571, *citing California Teachers Association v. Riles*, 29 Cal.3d 794, 176 Cal.Rptr. 300, 632 P.2d 953 (1981). Under the *Riles* test, a

court must consider " 'whether the aid is direct or indirect, and second whether the nature of the aid is substantial or incidental.' " *Hewitt*, 940 F.2d at 1571, *quoting Sands v. Morongo Unified School District*, 53 Cal.3d 863, 281 Cal.Rptr. 34, 809 P.2d 809 (1991) (Mosk, J. concurring) (citation omitted).

Applying the two-part *Riles* test in *Hewitt*, the Ninth Circuit found that the biblical statuary park violated the ban on aid to religion clause. Specifically, the court found that the County' support of the park, holding the deed and paying for its maintenance, was clearly direct. Furthermore, the financial support given by the County and the religious preference exhibited by the display more than incidentally benefitted the religious view symbolized by the park's statuary.

■ Contrary to the biblical statuary in *Hewitt*, there is no direct aid to the Mount Davidson Cross by S.F. At most, any indirect benefit to religion results from the display of the Mount Davidson Cross on public property. However, the same indirect benefit would result if S.F. were to authorize a religious group a permit to hold a holiday observance at the park atop Mount Davidson, an act which can not be said to be unconstitutional under Article XVI, Section 5. Furthermore, because no financial support is provided, and because no religious preference is exhibited,[11] S.F.'s ownership and display of the Mount Davidson Cross, at most, incidentally benefits the religious view symbolized. Thus, the Mount Davidson Cross survives constitutional scrutiny under the two-prong *Riles* test.

Therefore, S.F.'s ownership of the Mount Davidson Cross does not violate the ban on

---

10. In the opinion of Chief Justice Bird in *Fox v. City of Los Angeles*, 22 Cal.3d 792, 150 Cal.Rptr. 867, 587 P.2d 663 (1978), "the prohibitions of Article XVI, section 5 would come into play even if no funds were expended." *Id.*, 22 Cal.3d at 806, 150 Cal.Rptr. at 876, 587 P.2d at 672 (Bird, C.J. concurring). However, in as much as the opinion is a concurrence, and Chief Justice Bird was the only Justice to reach the issue as it relates to Article XVI, section 5, it is mere dicta. Moreover, the leading California and

Ninth Circuit cases finding a violation of Article XVI, section 5, involved the expenditure of public funds, unlike this case. *See, e.g., County of Los Angeles v. Hollinger*, 221 Cal.App.2d 154, 34 Cal.Rptr. 387 (1963); *Frohliger v. Richardson*, 63 Cal.App. 209, 218 P. 497 (1923); *California Teachers Association v. Riles*, 29 Cal.3d 794, 176 Cal.Rptr. 300, 632 P.2d 953 (1981); *Hewitt v. Joyner*, 940 F.2d 1561 (9th Cir.1991).

11. *See* earlier discussion at pp. 342–44.

aid to religion clause of Article XVI, Section 5 of the California Constitution.

### 3. Conclusion

In summary, on these facts, the evidentiary record before this Court does not support a conclusion that, by passively allowing the partially visible Mount Davidson Cross to remain unlit at the top of a mountain· in a residential district where it has stood for almost six decades, San Francisco is giving its stamp of approval to Christianity or preferring Christianity over other religions in violation of Article I, Section 4 of the California Constitution. Nor can it be held that San Francisco is granting aid, money or support to religion in violation of Article XVI, Section 5 of the California Constitution.

### C. The United States Constitution

#### 1. Overview

■ The most significant recent United States Supreme Court opinion on point is *County of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989). It is significant for a number of reasons, not only for its content, but also because Justice Blackmun announced the judgment and delivered the opinion of the court; an opinion in which Justice O'Connor concurred in part, concurred in the judgment, and filed an opinion in which Justices Brennan and Stevens joined in part. Justice Brennan concurred in part and dissented in part and filed an opinion joined by Justices Marshall and Stevens. Additionally, Justice Stevens concurred in part and dissented in part, and filed an opinion joined by Justices Brennan and Marshall. And lastly, Justice Kennedy concurred in the judgment and dissented in part and filed an opinion joined by Chief Justice Rehnquist and Justices White and Scalia. With this "clear and binding" precedent, this Court is now charged with the task of determining what is constitutional and what is not, and specifically, whether S.F.'s ownership and display of a Latin Cross in the public park atop Mount Davidson violates the First Amendment to the United States Constitution. After considering all of the evidence presented by the plaintiffs and the defendants, this Court holds that San Francisco's ownership and display of the Mount Davidson Cross does not violate the U.S. Constitution.

#### 2. Standard of Review

■ The First Amendment to the U.S. Constitution begins "Congress shall make no law respecting an establishment of religion." [12] The Establishment Clause, however, does not mandate total separation between government and religion. The history of the United States is replete with official references to the value and invocation of Divine guidance in deliberations and pronouncements. Government has recognized and subsidized holidays, such as Christmas and Thanksgiving, with religious significance. *See Lynch v. Donnelly*, 465 U.S. 668, 675, 104 S.Ct. 1355, 1360, 79 L.Ed.2d 604 (1984). Other examples concerning our countries rich religious heritage include the statutorily prescribed national motto "In God We Trust", 36 U.S.C. 186, and "One nation under God", 36 U.S.C. 172, as part of the Pledge of Allegiance. In addition, the National Gallery of Art, in Washington, DC, maintained with government support, has exhibited masterpieces with religious messages. Even the U.S. Supreme Court displays a permanent symbol of religion, as a tableau of Moses with the Ten Commandments hangs prominently in the Court's Chamber. *See Lynch*, 465 U.S. at 676–77, 104 S.Ct. at 1360–61.

Given our nation's strong religious history, the Supreme Court has stated that it "has come to understand the Establishment Clause to mean that government may not promote or affiliate itself with any religious doctrine or organization." *Allegheny*, 492 U.S. at 573, 109 S.Ct. at 3086. In analyzing cases challenging the constitutionality of a government practice under the Establishment Clause, "the inquiry calls for line-drawing; no fixed, per se rule can be framed." *Lynch*, 465 U.S. at 678, 104 S.Ct. at 1361 (emphasis in the original).

---

**12.** The Establishment Clause became applicable to the states by the fourteenth amendment in 1947, *see Everson*, 330 U.S. at 5, 67 S.Ct. at 506, and thus, was not applicable when S.F. decided to erect the Mount Davidson Cross in 1934.

In order to facilitate this "line-drawing process," *id.* at 679, 104 S.Ct. at 1362, the Supreme Court, in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), enunciated a three prong test for determining whether a government practice violates the Establishment Clause.

Under the *Lemon* analysis, a statute or practice which touches upon religion, if it is to be permissible under the Establishment Clause, must have a secular purpose; it must neither advance nor inhibit religion in its principal or primary effect; and it must not foster an excessive entanglement with religion.

*Allegheny,* 492 U.S. at 591, 109 S.Ct. at 3100, *citing Lemon,* 403 U.S. at 612–13, 91 S.Ct. at 2111. However, the Supreme Court has "repeatedly emphasized [its] unwillingness to be confined to any single test or criterion in this sensitive area." *Lynch,* 465 U.S. at 679, 104 S.Ct. at 1362 (and cases cited therein). See also, *Allegheny,* 492 U.S. at 590, 109 S.Ct. at 3099 (" 'the myriad, subtle ways in which Establishment Clause values can be eroded' are not susceptible to a single verbal formulation.") (citation omitted).

 With this understanding, this Court declines to take a rigid or absolutist approach in applying the *Lemon* test to this case.[13] *See Cammack v. Waihee,* 932 F.2d 765, 773 (9th Cir.1991).

### 3. The *Lemon* Test

#### (a). *Secular Purpose*

The first prong of the *Lemon* test requires that the government practice at issue has a secular purpose. *Lemon,* 403 U.S. at 612, 91 S.Ct. at 2111. Recently, the United States Court of Appeals for the Ninth Circuit in *Cammack v. Waihee,* 932 F.2d 765 (9th Cir.1991) defined the standard applicable to determining whether a government practice violates the purpose prong of *Lemon:*

The purpose prong is clearly violated when there is no legitimate secular purpose for the [government practice].... When there are both religious and legitimate, sincere secular purposes motivating [the government practice], it appears that the existence of the secular purpose will satisfy the first *Lemon* prong.

*Id.* at 773. Thus, a government practice violates the purpose prong "only if it is motivated wholly by an impermissible purpose." *Bowen v. Kendrick,* 487 U.S. 589, 602, 108 S.Ct. 2562, 2570, 101 L.Ed.2d 520 (1988) *quoted in Cammack,* 932 F.2d at 774.

Applying this standard, S.F.'s ownership and display of the Mount Davidson Cross easily passes constitutional muster under the first prong of the *Lemon* test. Based on the evidentiary record before this Court, this Court finds that San Francisco's ownership and maintenance of the Mount Davidson Cross is not "motivated wholly by an impermissible purpose," and thus, does not violate the secular purpose prong of *Lemon.*[14]

The evidence in this case demonstrates that San Francisco possessed a legitimate,

---

**13.** As Justice Kennedy so eloquently stated:

I am content for present purposes to remain within the *Lemon* framework, but do not wish to be seen as advocating ... [this] test as the primary guide in this difficult area. Persuasive criticism of *Lemon* has emerged. [Supreme Court] cases often question its utility in providing concrete answers to Establishment Clause questions, calling it but a " 'helpful signpos[t]' " or " 'guidelin[e]' ", to assist our deliberations rather than a comprehensive test. [The Supreme Court has] repeatedly emphasized [its] unwillingness to be confined to any single test in this sensitive area. Substantial revision of the Establishment Clause doctrine may be in order; but ... even the *Lemon* test, when applied with the proper sensitiv-

ity to our traditions and our caselaw, supports the conclusion [reached by this Court] ... that the City's ownership and display of the Mount Davidson Cross is permissible under the Establishment Clause. *Allegheny,* 492 U.S. at 655, 109 S.Ct. at 3134 (Kennedy, J., joined by the Chief Justice, White, J., and Scalia, J., concurring in the judgment in part and dissenting in part) (citations and quotations omitted).

**14.** "In reviewing a challenged [practice] for a secular purpose, [this Court] must be 'reluctant to attribute unconstitutional motives to the [city's], particularly when a plausible secular purpose for the [city's practice] may be discerned ...' " *Cammack,* 932 F.2d at 774, *quoting Mueller v. Allen,* 463 U.S. 388, 394–95, 103 S.Ct. 3062, 3066–67, 77 L.Ed.2d 721 (1983).

secular purposes for constructing the Mount Davidson Cross in 1934. Historical records reveal that the idea of constructing a structure in the form of a cross on Mount Davidson was not originated by the city.· The Mount Davidson Cross was the idea of James Decatur, who was an official of Western Union, a director of the YMCA and an active member of the Episcopal Church.

While there is evidence that Decatur was a deeply religious man and his idea of erecting the Mount Davidson Cross was motivated at least in significant part by religious reasons, there is virtually no evidence that city leaders shared Decatur's religious motivation. Indeed, the historical evidence indicates that S.F. embraced the project cautiously, proceeding with the construction of the Mount Davidson Cross only after seeking advice of legal counsel, and approval by the Art Commission. As set forth earlier in this opinion, historical records reflect that S.F. built the Mount Davidson Cross as a public monument and work of art, not as an endorsement of Christianity or any particular sect. The historical evidence establishes that S.F.'s subjective intent in constructing the Mount Davidson Cross was to erect and place a work of art in a neighborhood park seen as an ideal place for contemplation and nature loving activities.

Based· on the evidentiary record before this Court, this Court cannot conclude that the sole purpose of the Cross was to advance religion or that the construction of the Cross was initiated by concerns that were solely religious in nature. Thus, this Court concludes that S.F.'s action in erecting the Mount Davidson Cross "had at

least a legitimate purpose." *Cammack,* 932 F.2d at 776.[15]

■ Even if the Court were to conclude that S.F.'s actual motivation for erecting the Mount Davidson Cross was solely for religious purposes, which it does not, this conclusion would not "compel a finding of improper purpose now, some fifty[-seven] years later." *Cammack,* 932 F.2d at 776. Presently, as the evidence suggests, the Mount Davidson Cross is owned as a work of art and cultural landmark. It was designed by a noted architect and approved by the Art Commission as a work of art pursuant to the city Charter. The Mount Davidson Cross can be viewed as part of S.F.'s public art collection, which also contains many other objects associated with different religions, such as sculptures of Buddha, Madonna, and St. Francis of Assisi, the patron saint for whom San Francisco is named. Additionally, given the unique background surrounding its erection and dedication, as discussed earlier in the opinion, the Mount Davidson Cross has attained both cultural and historical value. Since the Mount Davidson Cross has cultural, historical and artistic significance as a landmark and work of art, S.F.'s ownership and maintenance of the Cross presently serves a secular purpose.

Based on all the evidence in the record before this Court, this Court concludes that S.F.'s stated secular purpose in owning and maintaining the Mount Davidson Cross is both legitimate and sincere, "and not a sham." *Cammack,* 932 F.2d at 774.

■ Plaintiffs, citing "an unbroken line of eight federal court cases,"[16] argue that

---

**15.** "The narrow question is whether there is a secular purpose for [San Francisco's] display of the [Mount Davidson Cross]," *Lynch,* 465 U.S. at 681, 104 S.Ct. at 1363, not that the purpose of the display is "exclusively· secular." *Id.* at 682, n. 6, 104 S.Ct. at 1363, n. 6.

**16.** See, e.g., *ACLU of Georgia v. Rabun County Chamber of Commerce, Inc.,* 698 F.2d 1098 (11th Cir.1983) (85 foot cross in public park); *Greater Houston Chapter of ACLU v. Eckels,* 589 F.Supp. 222 (E.D.Tex.1984) (erection of three cross and a star of david with public funds); *Jewish War Veterans v. United States,* 695 F.Supp. 3 (D.D.C. 1988) (65 foot cross on military base); *ACLU of*

*Mississippi v. Mississippi State Gen. Servs. Admin.,* 652 F.Supp. 380 (S.D.Miss.1987) (seasonal display of cross on government building); *ACLU of Illinois v. City of St. Charles,* 794 F.2d 265 (7th Cir.1986) (same); *Libin v. Town of Greenwich,* 625 F.Supp. 393 (D.Conn.1985) (same); *Gilfillan v. City of Philadelphia,* 637 F.2d 924 (3d Cir. 1980) (use of public funds to construct cross); *Mendelson v. City of St. Cloud,* 719 F.Supp 1065 (M.D.Fla.1989) (cross displayed on government building).

To the extent that these cases are not decisions of the Ninth Circuit or the U.S. Supreme Court, they are not controlling on this Court.

the display of the latin cross, as the pre-eminent symbol of Christianity, does not have a secular purpose. However, plaintiffs' emphasis on the fact that the latin cross is the pre-eminent symbol of Christianity is misguided. The inquiry under the first prong of the *Lemon* test is not whether the cross is a religious symbol, as it undoubtedly is, but rather, whether San Francisco has a legitimate, sincere secular purpose in displaying the particular cross. The creche in *Lynch* was indisputably a religious symbol, but the government had a secular purpose for displaying the creche.[17] Thus, the inquiry under *Lemon* and prevailing Supreme Court precedent is not whether "it" is a religious symbol, but rather, whether there is a secular purpose for "its" display.

The record before this court, as described in the foregoing discussion, indicates that S.F. continues to display the Mount Davidson Cross as a work of art, a cultural landmark, and as part of the history of San Francisco. On these facts, S.F. has "at least a legitimate, sincere secular purpose" for displaying the Mount Davidson Cross. *Cammack*, 932 F.2d at 776 (emphasis in the original).

Accordingly, San Francisco's ownership and display of the Mount Davidson Cross does not violate the first prong—the secular purpose prong—of the *Lemon* test.

(b). *Secular Effect*

The second prong of the *Lemon* test requires that the government practice neither advance nor inhibit religion in its principal or primary effect. *Lemon*, 403 U.S. at 612, 91 S.Ct. at 2111. The inquiry under this prong is "whether the challenged governmental practice has either the purpose or effect of 'endorsing' religion." *Allegheny*, 492 U.S. at 591, 109 S.Ct. at 3100.[18] Whether the challenged governmental practice unconstitutionally endorses religion, in turn, necessarily depends on its particular physical setting. *See Allegheny*, 492 U.S. at 593, 109 S.Ct. at 3101 ("the effect of a creche display turns on its setting").[19] Based on the evidentiary record in the case at bar, this Court concludes that S.F.'s current ownership and display of the Mount Davidson Cross, judged within its context of secular original and contemporary history, its landmark qualities, and its secluded geographic location, does not have the principal or primary effect of advancing or endorsing religion.

In *Allegheny*, the Supreme Court was faced with two separate challenges to: (1) a creche displayed inside the County Courthouse; and (2) a menorah displayed next to a christmas tree in front of the City–County Building. The Court found that the display of the creche violated the effects prong of *Lemon*, but that the display of

---

Moreover, these cases are easily distinguishable both factually and legally from the case at bar. Four involve displays on government buildings and thus were violative of the effects prong, *see, e.g., Mississippi State; City of St. Charles; Libin;* and *Mendelson.* The *Jewish War Veterans* case was also invalidated under the effects prong. Two involve the use and expenditure of public funds, *see, e.g., Eckels;* and *Gilfillan.* Two employ a "more secular alternative" analysis which has never been recognized by a majority of the Supreme Court, *see, e.g., Rabun County;* and *Eckels.*

17. In *Lynch*, "[t]he District Court inferred from the religious nature of the creche that the city had no secular purpose for the display ..." but the Supreme Court rejected this approach, instead, analyzing the purpose behind the city's "inclusion of the creche in the display ..." and finding that the display of the creche "depicts the historical origins of this traditional event."

*Lynch*, 465 U.S. at 680, 104 S.Ct. at 1362. See also *Allegheny*, 492 U.S. at 632–37, 655, 109 S.Ct. at 3122–24, 3134 (where five Justices recognized the menorah as a religious symbol, but found it to survive constitutional scrutiny under the Establishment Clause).

18. The Court in *Allegheny* recognized that "the word 'endorsement' is not self-defining.... but rather, the inquiry prohibits 'favoritism,' 'preference,' or 'promotion.'" *Allegheny*, 492 U.S. at 591–93, 109 S.Ct. at 3100–3101.

19. *See also, Allegheny*, 492 U.S. at 596, 109 S.Ct. at 3103 ("That inquiry, of necessity, turns upon the context in which the contested object appears ... Every government practice must be judged in its unique circumstances to determine whether it [endorses] religion.") (Blackmun, J. joined by Stevens, J. concurring); *Id.* 492 U.S. at 625, 109 S.Ct. at 3118 (same) (O'Connor, J. concurring).

the menorah did not.[20] The critical distinction between the two displays centered on an examination of the entire context of the displays.

The context in which the *Allegheny* creche was displayed is easily distinguishable from S.F.'s display of the Mount Davidson Cross. The creche in *Allegheny* was not only located in the County Courthouse, but it also sat on the Grand Staircase, "the 'main' and 'most beautiful part' [and 'most public' part] of the building that is the seat of county government." *Allegheny*, 492 U.S. at 598, 109 S.Ct. at 3104. Moreover, "the county's own press releases made clear to the public that the county associated itself with the creche." *Id.*, 492 U.S. at 600, n. 50, 109 S.Ct. at 3104, n. 50. On these facts, "[n]o reasonable viewer could reasonably think that it occupies this location without the support and approval of the government." *Id.*, 492 U.S. at 598, 109 S.Ct. at 3104. Thus, the *Allegheny* Court held, "by permitting the 'display of the creche in this particular physical setting,' the county sends an unmistakable message that it supports and promotes the ... creche's religious message." *Id.*

On the other hand, as discussed earlier in this opinion, the Mount Davidson Cross is not located on, in front of, adjacent to, or even near city hall or any city owned building. To the contrary, the Mount Davidson Cross is located in a relatively remote place, surrounded by a wooded and natural wilderness environment making it only partially visible on a clear day, and can not be seen at night. It is certainly not located in the "main" and "most beautiful" and "most public" part of the city. Moreover, there are no "press releases" or signs identifying the Mount Davidson Cross as belonging to the city or associating the city with the cross.

Furthermore, as discussed earlier in this opinion, the Mount Davidson Cross has become an integral part of the historical and cultural landscape of San Francisco. The quality and significance of the Mount

Davidson Cross' historical and cultural heritage is relevant in determining whether it has the effect of endorsing religion.

Under the endorsement test, the "history and ubiquity" of a practice is relevant not because it creates an "artificial exception" from that test. On the contrary, the "history and ubiquity" of a practice is relevant because it provides part of the context in which a reasonable observer evaluates whether a challenged governmental practice conveys a message of endorsement of religion. *Allegheny*, 492 U.S. at 630, 109 S.Ct. at 3121 (O'Connor, J. concurring); *See also, Id.*, 492 U.S. at 602–611, 109 S.Ct. at 3106–3110 (majority opinion). In viewing its unique historical and cultural background, and its physical setting, a viewer could reasonably think that the Mount Davidson Cross occupies its remote location without the support and approval of government endorsement of religion.

Thus, based on the evidentiary record before this Court, this Court concludes that by permitting the display of the Mount Davidson Cross in its particular physical setting, and given its unique historical and cultural background, S.F. does not send an unmistakable message that it supports and promotes the cross's religious message. Therefore, San Francisco's ownership and display of the Mount Davidson Cross does not violate the second prong—the secular effect prong—of the *Lemon* test.

#### (c). *Excessive Entanglement*

The third prong of the *Lemon* test prohibits excessive government entanglement with religion. *Lemon*, 403 U.S. at 613, 91 S.Ct. at 2111. The Ninth Circuit instructs that "[t]he entanglement prong seeks to minimize the interference of religious authorities with secular affairs and secular authorities in religious affairs." *Cammack*, 932 F.2d at 780. The Supreme Court has further recognized that "[e]ntanglement is a question of kind and degree." *Lynch*, 465 U.S. at 684, 104 S.Ct. at 1365.

---

**20.** The only issue addressed by the Supreme Court in *Allegheny* was whether the two displays violated the effects prong. The purpose and

entanglement elements of the *Lemon* inquiry were not addressed by the Court. *See Allegheny*, 492 U.S. at 594, n. 45, 109 S.Ct. 3101, n. 45.

In this case, as in *Lynch*, there is no evidence of contact with church authorities concerning the content or design of the cross prior to its construction. Even if there were such contact, it would have occurred fifty-seven years ago, and there is no evidence of such contact presently. Additionally, as in *Lynch*, no expenditures for maintenance of the cross are necessary; at best the tangible amount benefitting the cross through expenditures for maintenance of the park is *de minimis*. Thus, as in *Lynch*, the evidence conclusively demonstrates that, "[t]here is nothing here ... like the 'comprehensive, discriminating, and continuing state surveillance' or the 'enduring entanglement' present in *Lemon*." *Lynch*, 465 U.S. at 684, 104 S.Ct. at 1365, *quoting Lemon*, 403 U.S. at 619–622, 91 S.Ct. at 2114–2116.

Evidence of entanglement may also be demonstrated if the challenged government action causes religion-based political divisiveness. *See Cammack*, 932 F.2d at 781. "[A] litigant cannot, by the very act of commencing a lawsuit, however, create the appearance of divisiveness and then exploit it as evidence of entanglement." *Lynch*, 465 U.S. at 684–685, 104 S.Ct. at 1365–66. Moreover, the Supreme Court "has not held that politically divisiveness alone can serve to invalidate otherwise permissible conduct." *Id.* at 684, 104 S.Ct. at 1365. Since "[t]his case does not involve a direct subsidy to church-sponsored schools or colleges, or other religious institutions, no inquiry into potential political divisiveness is even called for." *Lynch*, 465 S.Ct. at 684, 104 S.Ct. at 1365, *citing Mueller v.*

*Allen*, 463 U.S. 388, 403–404, n. 11, 103 S.Ct. 3062, 3071–3072, n. 11, 77 L.Ed.2d 721 (1983). In any event, there is no evidence of either S.F. being excessively entangled in religious affairs as a result of its ownership of the Mount Davidson Cross or that the cross passively standing in a municipal park creates political divisiveness along religious lines.

Therefore, San Francisco's ownership and display of the Mount Davidson Cross does not result in excessive government entanglement in violation of the third prong of the *Lemon* test.

### 4. Conclusion

In summary, given the unique original and contemporary history, landmark quality, geographic location, and physical surroundings of the Mount Davidson Cross, the evidentiary record before this Court does not support the conclusion that S.F.'s ownership and maintenance of the Mount Davidson Cross violates the Establishment Clause of the First Amendment to the United States Constitution under the *Lemon* analysis.[21]

### V. CONCLUSION

The Mount Davidson Cross is not situated within, on top of, adjacent to, or near City Hall or any other governmental buildings, nor can it be viewed with governmental buildings as the primary backdrop. Instead, it stands silently, often obstructed by darkness, fog, and trees, in the same location where it has stood for 57 years as part of the rich history and culture of San

---

21. In *Allegheny*, Justice Kennedy, joined by three other Justices, filed a separate opinion that departed from the traditional *Lemon* analysis. He criticized the Court's holding that the County of Allegheny's display of a creche in the County Courthouse violated the Establishment Clause. He concluded that the court's treatment of the creche issue "reflects an unjustified hostility towards religion, a hostility inconsistent with our history and our precedents." 492 U.S. at 655, 109 S.Ct. at 3134. The four Justices then advanced two principles in evaluating Establishment Clause cases:

> [g]overnment may not coerce anyone to support or participate in any religion or its exercise; and it may not, in the guise of avoiding hostility or callous indifference, give direct

benefits to religion in such a degree that in fact "establishes a [state] religion or religious faith, or tends to do so."

*Id.* 492 U.S. at 658–59, at 3136, *quoting Lynch*, 465 U.S. at 678, 104 S.Ct. at 1361.

Judged by Justice Kennedy's Establishment Clause test, the constitutionality of the Mount Davidson Cross would likewise be upheld. San Francisco does not coerce anyone to support or participate in any religion or its exercise at, near, or involving the Mount Davidson Cross. San Francisco's minimal maintenance of the Mount Davidson area does not constitute direct benefits to religion in such a degree that in fact establishes a state religion or religious faith, or tends to do so.

Francisco. The park is not even identified as belonging to the city. It appears ironic that San Francisco, which not only tolerates but appears to embrace literally almost any activity, conduct or philosophy, regardless of how strange or unusual, would somehow be deemed to be making law establishing or preferring any particular religion. Therefore, the display of the Mount Davidson Cross, in this context, need not be permanently enjoined.

Accordingly, for all of the foregoing reasons, defendants' motion for summary judgment is hereby GRANTED and plaintiffs' motion for summary judgment is hereby DENIED.

IT IS SO ORDERED.